# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND, et al., | ) | |
|                        **Plaintiffs,** | ) | **Case No.: 08 C 6871** |
|        **v.** | ) | **Judge Shadur** |
| ACES ENVIRONMENTAL, CORP., a | ) | |
| dissolved Illinois corporation, ACES | ) | |
| ENVIRONMENTAL CONSULTING CORP., | ) | |
| an Illinois corporation, BONNIE COYNE, | ) | |
| individually, and DANIEL COYNE, | ) | |
| individually, | ) | |
|                        **Defendants.** | ) | |

## MOTION TO REINSTATE AND CONFESS JUDGMENT

Now come Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity and James S. Jorgensen, Administrator of the Funds (hereinafter collectively referred to as the "Funds"), by and through their attorney, Patrick T. Wallace, and hereby move this Court to reinstate this case and enter judgment in favor of the Funds and against Defendants Aces Environmental, Corp., Aces Environmental Consulting Corp., Bonnie Coyne, and Daniel Coyne on the defaulted Installment Note. In support of this Motion, Plaintiffs state as follows:

1.      The parties entered into a Settlement Agreement and Stipulation to dismiss setting the case pursuant to the terms of an Installment Note ("Note"), Guaranty of Payment and Indemnification ("Guaranty") and Commercial Security Agreement ("CSA"). Pursuant to the parties' Settlement Agreement and Stipulation to Dismiss, the Court entered an Order dated February 26, 2010 dismissing the case without prejudice and retaining jurisdiction to enforce the terms of the Note, Guaranty, and CSA. A true and accurate copy of the Court's Order is attached hereto as Exhibit A.

2. The Defendants have failed to satisfy their obligations on the Note. Specifically, the Defendants have failed to submit payment of $12,117.65 due at the time the Note was entered into. The Defendants have also failed to submit the first installment due on March 15, 2010 in the amount of $5,683.93. In addition, the Defendants have failed to submit and pay their benefit reports and contributions for the period of January and February 2010. See Affidavit of Jim Fosco ("Fosco Aff.), attached hereto as Exhibit B, ¶ 6.

3. Accordingly, the Funds respectfully request that this Court reinstate the case and enter judgment in favor of the Funds and against Defendants Aces Environmental, Corp., Aces Environmental Consulting Corp., Bonnie Coyne, and Daniel Coyne in the amount of $149,668.75 representing the outstanding amounts due on the defaulted Note and Guaranty, and $480.00 representing additional attorneys' fees and expenses incurred by the Funds in enforcing the Note and bringing this Motion. See Fosco Aff., ¶ 6, Declaration of Patrick T. Wallace, attached hereto as Exhibit C.

WHEREFORE, the Funds respectfully request that this Court reinstate the case and enter judgment in favor of the Funds and against Defendants Aces Environmental, Corp., Aces Environmental Consulting Corp., Bonnie Coyne, and Daniel Coyne in the amount of $150,148.75 representing $149,668.75 outstanding amounts due on the defaulted Note and

Guaranty, and $480.00 in additional attorneys' fees and expenses incurred by the Funds in enforcing the Note and bringing this Motion.

Date:  April 5, 2010                              Respectfully submitted,

                                                  Laborers' Pension Fund, et al.


                                                  By: /s/ Patrick T. Wallace

Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND et al., )
                   **Plaintiffs,** )     **Case No.:  08 C 6871**
    **v.** )
                               )     **Judge Shadur**
ACES ENVIRONMENTAL, CORP., a )
dissolved Illinois corporation, ACES )
ENVIRONMENTAL CONSULTING CORP., )
an Illinois corporation, BONNIE  COYNE, )
individually, and DANIEL COYNE, )
individually, )
                   **Defendants.** )

## ORDER

This matter having come before the Court on the Parties Settlement Agreement and Stipulation to Dismiss, due notice having been given IT IS HEREBY ORDERED:

1.      That Aces Environmental Consulting Corp. and Daniel Coyne are added as Defendants in this case waiving service of summons and amended complaint.

2.      That this matter is dismissed without prejudice pursuant to the terms of the Parties Settlement Agreement and that this Court retains jurisdiction to enforce the terms of Settlement Agreement including the Installment Note, Guaranty of Payment and Indemnification Agreement and CSA Agreement through March 31, 2012.

3.      If no timely motion has been brought to reinstate and enforce the terms of the Settlement Agreement on or before March 31, 2012 this matter shall thereafter be dismissed with (4) ~~without~~ prejudice.

Dated:  **Feb 26, 2010**          ENTER:

                                            _____
                                        The Honorable Milton I. Shadur
                                        United States District Court Judge



EXHIBIT
A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND et al., | ) | |
| Plaintiffs, | ) | Case No.: 08 C 6871 |
| v. | ) | |
| | ) | Judge Shadur |
| ACES ENVIRONMENTAL, CORP., a | ) | |
| dissolved Illinois corporation, ACES | ) | |
| ENVIRONMENTAL CONSULTING CORP., | ) | |
| an Illinois corporation, BONNIE COYNE, | ) | |
| individually, and DANIEL COYNE, | ) | |
| individually, | ) | |
| Defendants. | ) | |

### <u>AFFIDAVIT OF JAMES FOSCO</u>

JAMES FOSCO, being first duly sworn on oath, deposes and states as follows:

1.      I am a Field Representative employed by the Laborers' Pension Fund and the

Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago

and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-

referenced action.  My responsibilities include oversight of the collection of amounts owed by

Defendant Aces Environmental, Corp. (hereinafter "Aces" or the "Company").  This Affidavit is

submitted in support of the Laborers' Funds' Motion for Summary Judgment.  I have personal

knowledge regarding the statements contained herein.

2.      On June 3, 1999, the Company signed an Independent Construction Industry

Collective Bargaining Agreement ("Agreement") with the Construction and General Laborers'

District Council of Chicago and Vicinity ("District Council") and Laborers' Local Union No.

225.  A true and accurate copy of the Agreement is attached hereto as Exhibit B-1.  Pursuant to

1



the terms of the Memoranda, the Company is bound to the terms of the relevant collective

bargaining agreements incorporated by reference in the Agreement and the Funds' respective

Agreements and Declarations of Trust.

    3.      Pursuant to agreement, the Funds have been duly authorized to act as collection

agents on behalf of the District Council for union dues owed to the District Council.

    4.      The Agreement and the Funds' respective Agreements and Declarations of Trust

to which the Company is bound require that the Company submit benefit reports and contribution

payments by the tenth day of the following month. Payments which are not received within thirty

days of this date are assessed liquidated damages in the amount of 10 percent or 20 percent

liquidated damages (on Pension, Welfare and Training Fund after June 1, 2007) of the principal

amount of delinquent contributions, and interest at a rate 12 percent annually from the date of

delinquency forward. The Agreement and the Funds' respective Agreements and Declarations of

Trust also obligate the Company to submit its books and records to the Funds for periodic audits

to determine benefit contribution compliance. A copy of the relevant portions of the Agreement

are attached as Exhibit B-2; a copy of the relevant portions of the Amended Agreement and

Declaration of Trust creating the Laborers' Pension Fund are attached as Exhibit B-3; and a copy

of the relevant portions of the Amended Health and Welfare Department of the Construction and

General Laborers' District Council are attached as Exhibit B-4.

    5.      The Company and Aces Environmental Consulting Corp. entered into an

Installment Note ("Note") on February 24, 2010 to pay various amounts owed by the Company to

the Funds. A true and accurate copy of the Note is attached hereto as Exhibit B-5. Bonnie

Coyne and Dan Coyne, officers and shareholders of Aces and Aces Environmental Consulting

2

Corp. respectively, entered into a Guaranty of Payment and Indemnification Agreement ("Guaranty") on February 24, 2010 agreeing to personally guarantee the amounts due on the Note. A true and accurate copy of the Guaranty is attached hereto as Exhibit B-6. The parties also entered into a Commercial Security Agreement ("CSA"), a true and accurate copy of which is attached hereto as Exhibit B-7.

6.      The Company is in default on the Note. Specifically, the Company failed to pay $12,117.65 due at signing on the Note and $5,683.93 due for the March 15, 2010 installment on the Note. The Company has also failed to submit benefit reports and contributions for the period of January and February 2010 and Dues reports and contributions for the period of November 2009 through February 2010. Pursuant to paragraph 10 of the Note, late paid installments are assessed liquidated damages as if they were monthly contributions. Accordingly, the Company owes the following amounts on the defaulted Note:

| | |
|---|---|
| Remaining amounts due at signing: | $12,117.65 |
| Welfare Installment due 3/15/10: | 3,252.56 |
| Pension Installments due 3/15/10: | 2,431.37 |
| Liquidated damages on 3/15/10 installment: | 1,136.78 |
| Accelerated amounts due on Note: | 130,730.39 |
| TOTAL: | 149,668.75 |

FURTHER AFFIANT SAYETH NOT.

James Fosco

Subscribed and sworn to before me this _____ 5th _____ day of April 2010.

Eugenia Mashos
Notary Public

```
"OFFICIAL SEAL"
EUGENIA MASHOS
Notary Public, State of Illinois
My Commission Expires 09/12/12
```

3



**HEADQUARTERS OF**

# Construction & General Laborers'
# District Council of Chicago and Vicinity

Affiliated with the Laborers International Union of North America, A.F. of L. - C.I.O.

6121 WEST DIVERSEY AVENUE · CHICAGO, ILLINOIS 60639 · PHONE: 773-237-7637 · FAX: 773-237-3417

LOCALS 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092

## INDEPENDENT CONSTRUCTION INDUSTRY
## COLLECTIVE BARGAINING AGREEMENT

**ACES ENVIRONMENTAL**

It is hereby stipulated and agreed by and between ACES ENVIRONMENTAL, herein called the "EMPLOYER", and the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, herein called the "UNION", representing and encompassing Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092 and encompassing the geographical areas of the counties of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone, in the State of Illinois, together with any other locals which may come within the jurisdiction of the UNION, that:

1. EMPLOYER, in response to the UNION's claim that it represents an uncoerced majority of each EMPLOYERS' laborer employees, acknowledges and agrees that there is no good faith doubt that the UNION has been authorized to and in fact does represent such majority of laborer employees. Therefore, the UNION is hereby recognized as the sole and exclusive collective bargaining representative for the employees now or hereafter employed in the bargaining unit with respect to wages, hours of work and other terms and conditions of employment in accordance with Section 9 of the National Labor Relations Act without the need for a Board certified election.

2. The EMPLOYER affirms and adopts the Collective Bargaining Agreements between the UNION and the Builders Association of Chicago and Vicinity, the Illinois Road Builders Association, the Underground Contractors Association, the Mason Contractors Association of Greater Chicago, the Concrete Contractors Association of Greater Chicago, G.C.I.A.L./C.A.W.C.C., the Lake County Contractors Association, the Contractors Association of Will and Grundy Counties, the Fox Valley General Contractors Association, the Chicago Demolition Contractors' Association, the Illinois Environmental Contractors Association, and all other multiple employer associations with whom the District Council or any of its affiliated local unions has a duly negotiated agreement, and re-establishes all agreements from June 1, 1978 together with all amendments thereto. Where no current Association agreement is negotiated, the terms of the most recent expired agreement are incorporated herein with all terms, conditions and dates extended for the duration hereof, until a current Agreement is reached and then incorporated retroactively herein. It is further agreed that where a contractor works in the jurisdiction of any local UNION, then the Association agreement covering the local UNION is herein specifically incorporated in this agreement and supersedes the standard District Council Agreement in the case of any conflict between the District Council agreement and the local Association agreement. Nothing herein shall limit the jurisdiction of the Agreement to less than that provided in this Agreement.

3. The EMPLOYER agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY (the LABORERS' PENSION FUND, the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND, the CHICAGO AREA LABORERS-EMPLOYER COOPERATION EDUCATION TRUST ("LECET"), and to all other designated Union-affiliated benefit funds, and to become bound by and be considered a party to the Agreements and Declarations of Trust creating said Trust Funds as if it had signed the original copies of the Trust Instruments and amendments thereto. The EMPLOYER ratifies and confirms the appointment of the EMPLOYER Trustees who shall, together with their successor Trustees, designated in the manner provided in said Agreements and Declaration of Trusts and jointly with an equal number of Trustees appointed by the UNION, carry out the terms and conditions of the Trust Agreements.

The EMPLOYER further affirms and re-establishes that all prior contributions paid to the Welfare, Pension, Training and LECET Funds were made by duly authorized agents of the EMPLOYER as at proper rates, for the appropriate periods of time, and that by making said prior contributions the EMPLOYER evidences the intent to be bound by the terms of the Trust Agreement and Collective Bargaining Agreements which were operative at the time the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the EMPLOYER to the applicable agreements.

4. Employees covered by this Working Agreement shall retain all the work traditionally performed by members of the UNION. The EMPLOYER agrees that it will not cause any work traditionally performed by work to be done at a construction site by employees other than those covered by the Memorandum of Agreement, except with the prior written consent of the UNION. Any EMPLOYER, whether acting as a character, general manager or developer, who contracts out or assigns any of the work coming within the jurisdiction of the UNION, shall assume the obligations of any such subcontractor for prompt payment of employees' wages and other benefits, including reasonable attorneys' fees incurred in enforcing the provisions hereof. Notwithstanding any agreement to the contrary, the EMPLOYER'S violation of any provision of this paragraph will give the UNION the right to take any other lawful action, including all remedies at law or equity.

5. In the event of any change in the ownership, management or operation of the EMPLOYER'S business by sale or otherwise, it is agreed that as a condition of such transfer or change that the new owner and management shall be fully bound by the terms and conditions of this Agreement. This Agreement is applicable to all successors and transferees of the EMPLOYER, whether corporate or otherwise. The EMPLOYER shall provide ten (10) days prior notice to the Union of the sale or transfer.

6. The negotiated wage and fringe benefit contribution rates in the various Collective Bargaining Agreements are as follows:

| June 1, 1998 | RATES RETROACTIVE |
|---|---|
| to | $ 3.27 Per Hour Health and Welfare Fund |
| | $ 2.05 Per Hour Pension Fund |
| May 31, 1999 | $ .10 Per Hour Training Fund (plus additional amounts in Association agreement) |
| | $ .05 Per Hour MCIAF (if applicable in Association agreement) |
| | $ .03 Per Hour LECET (to be deducted from MCIAF if LECET contribution is not provided in Association agreement) |
| | $ .01 Per Hour Chicagoland Safety Council (if applicable) |
| | In addition, the Employer shall pay other amounts if provided in appropriate Association agreements for industry funds. |

| June 1, 1999 | $ 1.55 Per Hour increase for the year June 1, 1999 through May 31, 2000 to be |
| to | allocated between wages and fringe benefits by the Union in its sole discretion. |
| May 31, 2000 | Welfare, Pension, Training and LECET Funds contributions to remain the same unless additional sums are allocated. |

| June 1, 2000 | $ 1.35 Per Hour increase for the year June 1, 2000 through May 31, 2001, to be |
| to | allocated between wages and fringe benefits by the Union in its sole discretion. |
| May 31, 2001 | Welfare, Pension, Training and LECET Funds contributions remain the same unless additional sums are allocated. |

All additional wage rates, dues checkoff, and fringe benefits that are negotiated or become effective after May 31, 2001, shall be incorporated in this Memorandum of Agreement.

7. Effective June 1, 1998, all EMPLOYERS covered by this Memorandum of Agreement incorporating the various Collective Bargaining Agreements shall deduct from the wages of employees covered by said contract, uniformly working dues in the amount of 1.5% of gross wages, or as determined by the UNION, and shall remit monthly to the UNION union designated to the EMPLOYER by the District Council the sums so deducted, together with an accurate list of employees from whom wages and dues were deducted and the amounts applicable to each employee, not later than the 10th day of the month following the month for which said deductions were made.

8. It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended and such deductions be made only pursuant to written agreements from each employee on whose account such deductions are made, which assignment shall not be irrevocable for a period of more than one year or beyond the termination date of the Memorandum of Agreement, whichever occurs sooner.

9. This Agreement shall remain in full force and effect through May 31, 2001 (unless an applicable Association agreement is of longer duration) and shall continue thereafter unless there has been given written notice, by registered or certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such notice the EMPLOYER and the UNION agree to be bound by the new area-wide negotiated contracts with the various Associations incorporating them into this Agreement and submitting this Agreement for the life of the newly negotiated contracts.

10. The EMPLOYER acknowledges and accepts the facsimile signatures on this contract as if they were the original signatures. The EMPLOYER further acknowledges receipt of a copy of the complete Joint Working Agreement. Upon request of the UNION, the EMPLOYER shall execute another agreement that reflects the total contract settlements incorporated herein.

Dated    **JUNE 3,**     **1999**
       *month / day*       *year*

ACCEPTED:

Laborers' Local Union No. **225**

By _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By _____
    Robert F. Bloch, Trustee

For Office Use Only: **I.E.C.A.**

**AGREEMENT**

**ACES ENVIRONMENTAL**
(Employer)

By: **Bonnie Coyne, President**
    (Print Name and Title)

*Bonnie Coyne*
    (Signature)

P. O. Box 737
    (Address)

Warrenville, IL   60555
    (City, State and Zip Code)

(630) 690-0189
    (Telephone)

TRUST FUND

630 393-6130 FAX

EXHIBIT
B-1
tabbies

JUNE 1, 2004 TO MAY 31, 2006

AGREEMENT

between the

ILLINOIS ENVIRONMENTAL
CONTRACTORS ASSOCIATION, INC.

and the

CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY
AND LABORERS LOCAL 225


EXHIBIT
B-2

reasonable attorneys fees incurred in enforcing the provisions hereof. Employer's violation of any provision of this Paragraph will give the Union the right to take any lawful action, including all remedies at law or equity.

## Article 9
## WAGES

Paragraph 1. The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2004 to and including May 31, 2006, shall be as set forth below for the respective following classification of asbestos laborer as defined herein: The wage rates include an increase of $2.20 per hour effective June 1, 2004 to May 31, 2005 for a wage rate of $ $29.00 per hour; and June 1, 2005 to May 31, 2006, a $2.20 per hour increase to be allocated between wages and fringe benefits by the Union in its sole discretion.

Containment Premium. If an employee works in containment without taking lunch or the paid breaks, the employee shall be paid eight (8) hours' pay for six and one-half (6.5) hours' work and shall be relieved of any further work duty.

Asbestos Laborer Foreman shall receive a minimum of Fifty ($.50) Cents wage premium over and above top Laborers' Scale under his supervision, except that in those cases for those Employers who have had a practice on or before July 15, 1991 of paying one ($1.00) Dollar to its Foremen as a premium over and above top Laborers' Scale, then such Employer shall continue to pay One ($1.00) Dollar to its Foremen.

Dosimeter Use A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure.

Paragraph 2. LABORERS TRAINING FUND

The Training Fund contributions shall be seventeen cents ($ 0.17) per hour for each hour worked from June 1, 2004 to May 31, 2005, for all employees covered under this Agreement to the Construction and General Laborers District Council of Chicago and Vicinity Training Fund payable to the Training Fund or a designated appointee at the end of each month and such additional sums as the Union may designate in its sole discretion from its total economic package on June 1 of each year covered under this Agreement. The terms of the trust establishing the Fund are incorporated by reference herein and all terms regarding auditing, assessments, non-payments and grace periods as set out in the Collective Bargaining Agreement regarding payment of Welfare and Pension Fund contributions shall apply as if fully set forth herein for the Construction and General Laborers District Council of Chicago and Vicinity Training Fund.

Paragraph 3. WELFARE: Beginning the period from June 1, 2004 to May 31, 2005, the Employer agrees to make Health and Welfare contributions of $6.31 per hour for each hour

worked by all Employees covered by this Agreement in addition to the wages herein stipulated. This $6.31 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

For the period June 1, 2005 to May 31, 2006, on May 1, if able but not later than June 1, the Union at its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article 9, Paragraph 1.)

Paragraph 4. PENSION: Beginning June 1, 2004, the Employer agrees to make a pension contribution of $3.44 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $3.44 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

For the period June 1, 2005 to May 31, 2006, on May 1, if able but not later than June 1, the Union at its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article 9, Paragraph 1.)

The parties agree that the Employer shall make separate checks for contributions to employee fringe benefit accounts and dues deductions, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten percent (10%) of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten percent (10%), waiving the necessity of any additional proof

thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

Paragraph 5. SUPERVISORS: To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 3 and 4 of Article 9 of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 3 and 4 of Article 9 hereof.

## Article 10
## DEMOLITION AND INTERIOR WRECKING
## (Strip out) WORK

Asbestos removal, abatement and/or remediation that is performed in conjunction with the removal of a stationary structure, building or improvement, or in conjunction with interior wrecking or strip out work, shall be performed under the agreement between the Union and the Chicago Demolition Contractors' Association (CDCA). At the Union's request, the Employer shall provide a copy of the wrecking permit, demolition contract or other conclusive evidence that the asbestos work performed on a specific job site is performed in conjunction with complete demolition work, interior wrecking or strip out work as defined in the CDCA Agreement. If the Employer fails to provide such conclusive evidence within one (1) working day, then the asbestos work shall be covered under the terms of this agreement, retroactive to the

commencement of the asbestos work, and continuing until such time as the Employer provides the conclusive evidence.

## Article 11
## TRAINEE/HELPER AND APPRENTICES

### Paragraph 1. TRAINEE/HELPERS

The Trainee/Helper rate shall be Sixty-six (66%) Percent of the base rate rounded up to the nearest penny plus full benefit contributions to the Laborers Health and Welfare and Pension Plans. After 800 hours of work in the industry, the rate shall be increased to eighty-five percent (85%) of the base rate rounded up to the nearest penny plus full benefit fund contributions. After 1600 hours work in the industry, the employee shall receive the full base rate plus full fringe benefit fund contributions. No present Laborer employee shall be replaced by a Trainee/Helper.

Employees with ten (10) or more Laborers will be allowed one (1) Trainee/Helper for every multiple of ten (10) Laborers per year. Said Trainee/Helper may work only 1600 hours in the construction industry which shall be cumulative among signatory Employers at the Sixty-six (66%) Percent rate or Eighty-five (85%) Percent rate, as applicable, after which time the Employee will become a full-rate Laborer, i.e. ten (10) Laborers - one (1) Trainee/Helper, twenty (20) Laborers - two (2) Trainee/Helpers, thirty (30) Laborers - three (3) Trainee/Helpers, etc.

Employers with three (3) to nine (9) Laborers will be allowed one (1) Trainee/Helper per year who may work only 1600 hours which shall be cumulative among signatory Employers at the appropriate rate (66% or 85%). Thereafter the Employee shall be compensated at the full Laborers rate.

All Trainee/Helpers must be registered with the Laborers District Council and the Training Fund. Upon inquiry by the Employers at time of registration, the Training Fund shall notify Employer of the number of hours accumulated by the Trainee/Helper in the industry. Any Trainee/Helper not registered shall receive the full Laborers rate. Violation of the above-stated ratios of Trainee/Helpers to Laborers will result in the Employer's forfeiture of the right to utilize Trainee/Helpers for one year.

All Health and Welfare, Pension, Industry and Trainee/Helper Fund contributions will commence immediately upon employment. Union affiliation will be required after seven (7) days of employment.

The Employer shall report monthly to the Training Fund the hours worked by each Trainee/Helper and the wages paid for such work.

Paragraph 2. APPRENTICE PROGRAM

In lieu of the Trainee/Helper Program provided for in Section 1, the Illinois Environmental Contractors Association, on behalf of the Employers covered under this Agreement, may elect in writing to participate in the Apprentice Program, described below. The Trainee/Helper Program and the Apprentice Program are mutually exclusive, and once the Association elects to participate in the Apprentice Program, Section 1 will be null and void, and no Employer shall be permitted thereafter to employ any Trainee/ Helper.

Paragraph 1. APPRENTICE COMMITTEE: The Employer hereby agrees that the Joint Apprenticeship Training Committee (JATC) shall have the authority to establish rules for the apprentice program, including penalties for violations of the apprenticeship rules, which are incorporated herein by reference.

Paragraph 2. APPRENTICE PROGRAM FUNDING: The apprenticeship program administered by the JATC shall be self sustaining. In addition to the sums set forth in Article 9, Paragraph 2 of the Agreement, effective January 1, 1999, or on the date when the Association elects to participate in the program, whichever is later, the Employer shall also contribute to the Training Fund an additional contribution of five cents ($.05) per hour for each hour worked by all employees covered by this agreement, or a lesser amount as may be determined by the JATC. Effective June 1, 1999 and June 1, 2000, or on the date when the Association elects to participate in the program, whichever is later, the contribution shall be increased as determined by the JATC, but in no event shall the aggregate contributions under this paragraph 2 exceed five cents ($.05) over the term of this Agreement.

Paragraph 3. The term of apprenticeship shall be 4,000 hours, or two years, whichever occurs later. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

Paragraph 4. The wages per hour paid to apprentices shall be as follows:

| | |
|---|---|
| 1st six (6) months: | 60% of journeyman (base) wages |
| 2nd six (6) months: | 70% of journeyman (base) wages |
| 3rd six (6) months: | 80% of journeyman (base) wages |
| 4th six (6) months: | 90% of journeyman (base) wages |
| After 24 months: | 100% of journeyman (base) wages |

Paragraph 5. The ratio of journeymen to Apprentices shall be six (6) laborer journeymen to one (1) laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of laborers being apprentices on any one job site of the Employer. Employers who employ a maximum of between one (1) and five (5) laborer journeymen shall be entitled to one (1) laborer apprentice, who may be assigned to job sites irrespective of the twenty percent (20%) job site

maximum specified in this provision.

Paragraph 6.  Referral of apprentices will be through the Local Union with jurisdiction over the job site.  All apprentices must be referred by the Local Union from approved JATC apprentices.  Employers requesting apprentices will be assigned an apprentice from the available JATC apprentice pool.  The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program.  Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5.  All apprentices must report their hours weekly to the JATC.  All apprentices will be tested for the presence of illegal substances at the time they enter the apprentice program.

If any Employer violates the provisions of this Article, it shall lose its right to employ Trainee/Helpers and Apprentices for one (1) year.

## Article 12
## BONDING

(a)(i)  Each Employer agrees that before commencing any work to which this Agreement applies, a performance bond in the sum of Fifty Thousand Dollars ($50,000.00) shall be provided to insure the prompt and full payment of all wages, fringe benefit contributions due to the Welfare Fund,  Pension Fund, and Training Fund, and Industry Education Fund contributions. Such bond, which shall be in the form appended hereto as the Appendix, shall:

(1)     be written by an insurance carrier with reserves in excess of One Million Dollars ($1,000,000.00) authorized, licensed, or permitted to do business in the State of Illinois; or

(2)     be secured by a cash deposit of the full amount of such bond in an account maintained jointly by the Trustees of the four (4) funds; or

(3)     be secured by other assets of personal sureties accept able to the Trustees which equal or exceed in value the full amount of the bond; or

(4)     be secured by any combination of (1), (2) and/or (3) above; and

(5)     be payable to the Trustees of the respective funds, as their interest may appear, in the event Employer fails to make prompt and full payment of his fringe benefit fund contributions.

If for any reason the amount of value of the security provided by the Employer should decrease below the amount specified above, the Employer agrees to provide such additional security as may be necessary to restore it to the proper sum upon written request of the Trustees of any of the funds.

(a)(ii)  The Association shall have the right to satisfy on behalf of its members, or any of them, the bonding requirement of paragraph (a)(i) above by the posting of a blanket bond in the amount of not less than Two Hundred Fifty Thousand Dollars ($250,000.00)  If any ASSOCIATION member is excluded from such bond, or if any Employer previously covered by such bond ceases to be eligible for coverage because of the cessation of its ASSOCIATION membership, the ASSOCIATION shall notify the Union and the respective funds of such exclusion in writing; bond coverage for the excluded member or Employer shall continue for sixty (60) days following receipt of such notice.

(a)(iii)  In the event an Employer fails for any reason to satisfy the bonding requirements of paragraph (a)(i) above, the Employer shall be personally liable to the funds named in paragraph (a)(i) in the amount of Fifty Thousand Dollars ($50,000.00) plus all unpaid amounts in excess of that sum which are due the funds by that Employer.  In the event the Employer is a corporation, liability under this paragraph shall be imposed not only on the corporation, but also personally on each corporate official of that Employer empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to do so.  The provisions of this paragraph shall in no way relieve or excuse any Employer of the obligation to provide the bond described in paragraph (a)(i) above, nor shall this provision limit the personal liability of said corporate officers based on operation of law.

(a)(iv)  Any Employer commencing work in violation of the requirements set forth above shall be in violation of the requirements set forth above shall be in violation of the fringe benefit fund contribution payment provisions of this Agreement.

(a)(v) The Union and/or the Fringe Benefit Funds may enforce the bond obligations set forth in this Article and collect the bond proceeds.  The attorneys fees and costs enforcing the bond obligations under this Article shall be charged to and paid by the Employer, but shall not be taken from the proceeds of the bond.

(b)  The Employer shall give notice to the Union and the appropriate fund offices in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(1)     Formation of Partnerships;
(2)     Termination of business;
(3)     Change of name commonly used in business operation;
(4)     Change in form of business organization;
(5)     Incorporation of business;
(6)     Dissolution of corporation;
(7)     Name and business organization of successor;
(8)     Admission to or withdrawal from any association operation as a multi-employer bargaining unit.

12

## Article 13
## INDUSTRY FUND

Paragraph 1. Effective June 1, 2004, each Employer shall pay into the Industry Education Fund the amount of $.07, or such lesser amount as the Association shall specify in writing to the Union, for each hour worked for the Employer by those of his Employees covered by this Agreement. An Employer shall make the Industry Education Fund payments at the same time and in the same manner as payments to the Laborers Training Fund, and the Union will promptly deposit the Industry Education Fund payments in a depository as directed by the Illinois Environmental Contractors Association, Inc. and will provide to the Association a report showing for each Employer the hours worked and the amount of the payment made.

Paragraph 2. The Industry Education Fund shall be used by the Illinois Environmental Contractors Association, Inc. for office and administrative expenses, collective bargaining, contract administration, promotion of the asbestos and lead abatement industry, educational programs, and related activities in accordance with the Association's Constitution and By-Laws, provided that the Industry Education Fund shall not be used to oppose the Union's efforts to organize workers in the asbestos and lead abatement industry, to finance any legal action against the Union, or for political activity.

Paragraph 3. Inasmuch as the existence and utilization of the Industry Education Fund should result in increased employment and, therefore, in increased job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement. If an Employer fails to make the payments required by this Article within thirty days following notice of default, the Association may commence an action against such Employer in any court having jurisdiction over the parties and the subject matter to collect the unpaid amount, plus attorney's fees, court costs, interest on the unpaid amount at the rate of 1% per month from the date when the payment was initially due until the date when it is received, and liquidated damages in the amount of 10% of the unpaid amount.

Paragraph 4. Effective June 1, 2004, each Employer shall pay the amount of five cents ($0.05) for each hour worked by those employees covered under this Agreement to the Chicago-Area Laborers-Employers Cooperation Education Trust ( LECET ). If an Employer defaults in paying this contribution, the Trustees may pursue the same remedies as are specified in Paragraph 3 above.

Paragraph 5. Effective June 1, 2004, each Employer shall pay the amount of twelve cents ($ .12) per hour for each hour worked by those employees covered under this Agreement to the Laborers' District Council Labor Management Cooperation Committee ("LDC/LMCC"). If an Employer defaults in paying this contribution, the LDC/LMCC trustees may pursue the same remedies as are specified in Paragraph 3, above. Effective June 1 of each year during this Agreement, the Union may in its sole discretion apportion from the total economic increase an

additional amount to be applied to the LDC/LMCC.

## Article 14
## PARTICULAR WORK RULES AND
## CLARIFICATION OF CONDITIONS

Paragraph 1. At the option of the Employer, wages shall be payable in the United States Currency or by check. Failure on the part of the Employer to have sufficient funds in the bank to meet pay checks issued workers, shall deprive such Employers henceforth from the right to pay by checks.

Paragraph 2. The Union agrees that the Employees whom it represents will accept and demand the wages and fringe benefit payments set forth in this Agreement, and the Employer agrees to pay the wages and fringe benefit payments herein stipulated.

Paragraph 3. Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated and a penalty of fifty (50%) percent of the amount of such pay shortage as just and liquidated damages because of such violation.

Upon conclusive proof that the Employer is guilty of paying less than the wages herein stipulated, then nothing in this Agreement shall be construed to take from the Union the right to remove workers it represents from the job, and henceforth to deny such Employer further right to the employment of its members.

Paragraph 4. The Union reserves and shall have the right to remove its men from any job upon the failure of the Employer to pay the wages due any of its Employees or fringe benefits which may be due by reason of the hours of employment.

Paragraph 5. The Employer hereby agrees to maintain proper temporary toilet and drinking facilities accessible to all Employees on the job and to comply with all OSHA, E.P.A., State and Federal guidelines covering such work.

Paragraph 6. The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes.

Paragraph 7. SOURCES FOR HIRING: When the Employer needs additional employees, he shall give the Local 225 equal opportunity with all other sources to provide suitable applicants, but the Employer shall not be required to hire those referred by Local 225 and neither the Laborers' District Council or Local 225 is an exclusive hiring hall. In those instances where an Employer may contact Local 225 for referrals, Local 225 shall select and refer applicants for

# RESTATED AGREEMENT

### AND

# DECLARATION OF TRUST

### CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002


EXHIBIT
B-3

(b)     To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)     To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

**Section I.     IN GENERAL.**  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work.  No

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process. including court fees. audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees on demand the names of its employees, their social security numbers, the hours worked by each employee, and such

-27-

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

## FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.    FILING OF A CLAIM.    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

**LABORERS' PENSION AND WELFARE FUNDS**

**POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS**

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

**The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":**

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

**The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":**

"Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)    EMPLOYER OWNED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    EMPLOYER OPERATED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)     <u>PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.</u>  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund.  The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable,  as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)     <u>MISCELLANEOUS PROVISIONS.</u>  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

<u>III.</u>

<u>Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.</u>

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

CHARLES COHEN    DATE 9-18-06            JOSEPH COCONATO    DATE 9/13/06

ALAN ESCHE    DATE 9/18/06            JAMES P. CONNOLLY    DATE 9/18/06

ROBERT G. KRUG    DATE 9/18/06        J. MICHAEL LAZZARETTO    DATE 9/18/06

RICHARD E. GRABOWSKI    DATE 9/18/06    FRANK RILEY    DATE 9/18/06

DAVID H. LORIG    DATE 9/18/06        LARRY WRIGHT    DATE 9/18/06

GARY LUNDSBERG    DATE 9/18/06        JEFF ZIEMANN    DATE 9-18-06

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003



1

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS.
The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.　Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.　Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.　Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.　Cash disbursement journals and general ledgers.

5.　Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.　　.

6.　Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.　Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.　Daily time records filed by employees or supervisors.

9.　Source documents and lists of job codes and equipment codes.

10.　Certified payrolls for public sector jobs where such payrolls are required.

11.　Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*


* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
### OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND
### GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

**The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":**

"A 'Deadbeat Employer' is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

**The following is added as Section (4) to Article VI, "Employer Contributions":**

"**Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.**

(a)     **EMPLOYER OWNED BY DEADBEAT EMPLOYER.** Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)     **EMPLOYER OPERATED BY DEADBEAT EMPLOYER.** Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)    PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund.  The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)    MISCELLANEOUS PROVISIONS.  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| | | | |
|---|---|---|---|
| _[signature]_ | | _[signature]_ | 9/19/06 |
| CHARLES J. GALLAGHER | DATE | JAMES P. CONNOLLY | DATE |
| _[signature]_ | 9/19/06 | _[signature]_ | 9/19/06 |
| ALAN ESCHE | DATE | RANDY DALTON | DATE |
| _[signature]_ | 9/19/06 | _[signature]_ | 9-19-06 |
| RICHARD E. GRABOWSKI | DATE | MARTIN FLANAGAN | DATE |
| _[signature]_ | 9/19/06 | _[signature]_ | 9/19/06 |
| DAVID H. LORIG | DATE | LIBERATO NAIMOLI | DATE |
| _[signature]_ | 9/19/06 | _[signature]_ | 9/19/06 |
| DENNIS MARTIN | DATE | SCOTT PAVLIS | DATE |
| _[signature]_ | 9/19/06 | _[signature]_ | 9/19/06 |
| TIM J. SCULLY | DATE | FRANK RILEY | DATE |

4

## INSTALLMENT NOTE

This Installment Note ("Note") is made between the Laborers' Pension Fund ("Pension Fund") and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Health and Welfare Fund" or collectively the "Funds"), the parties of the first part, and Aces Environmental Corporation and Aces Environmental Consulting Corporation (the "Company"), the party of the second part.

WHEREAS, the Company has at all relevant times been party to a collective bargaining agreement ("CBA") with the Construction and General Laborers' District Council of Chicago and Vicinity, whereunder it is obligated to make certain contributions to the above-named Funds, as well as to the Training Fund, on behalf of its covered employees, and to submit payment of all employee union dues:

WHEREAS, the Company has failed to timely pay certain contributions owed to the Funds for the period of January 2005 thru July 2009.

WHEREAS, the Company has failed to remit certain union dues to the Funds, as the designated collection agent for the Construction and General Laborers' District Council of Chicago and Vicinity, for the period of January 2005 thru July 2009.

WHEREAS, the Company desires to pay all delinquencies owed to the Funds, to pay all union dues owed to the Construction and General Laborers' District Council of Chicago and Vicinity, together with liquidated damages, and interest, as set forth below and further desires to remain current in its obligation to pay contributions to the Funds.

THE PARTIES HEREBY AGREE as follows:

1. The Company will pay 87,672.48 to the Health and Welfare Fund (comprised of $62,577.62 in delinquent contributions, $14,699.47 in liquidated damages, $3,053.75 in attorneys fees and costs, $1,557.50 in audit costs and $5,784.14 in interest) (based on an interest rate of 5.25%). The Company will also pay $59,883.70 to the Pension Fund (comprised of $46,460.84 in delinquent contributions, $4,769.92 in liquidated damages, $3,053.75 in attorneys fees and costs, $1,557.50 in audit costs and $4,041.69 in interest). All of these amounts shall be paid according to the schedule described below in paragraphs 5 and 6.

2. The Company will also pay $2,217.68 to the Training Fund (comprised of $,1837.11 in delinquent contributions, $315.98 in liquidated damages and $64.59 in interest), $652.28 to the IECA Fund (comprised of $580.03 in delinquent contributions, $58.01 in liquidated damages and $14.24 in interest), $333.10 to the LECET Fund (comprised of $295.28 in delinquent contributions, $29.52 in liquidated damages and $8.30 in interest), $681.50 to the LDCMC Fund (comprised of $601.56 in delinquent contributions, $60.16 in liquidated damages and $19.78 in interest) and $5,818.28 in union dues (comprised of $4,390.06 in delinquent contributions and $1,428.22 in liquidated damages). These delinquent amounts shall be paid in their entirety at the time payment under this Note commences, in accordance with the schedule described in paragraph 5.

3. The Company will also pay the Funds or the sum of $6,107.50 representing attorney fees and costs incurred by the Funds in Case No.08 C 6871. This amount is split equally between Welfare and Pension as described in paragraph 1 above.

4. The Company will also pay the Funds the sum of $3,115.00 in audit costs. This amount split equally between Welfare and Pension as described in paragraph 1 above.

5. Simultaneously with the execution of this Note, the Company will pay twenty percent (20%) of the total outstanding indebtedness, excluding note interest and the delinquent amounts described above in paragraph 2, or $17,471.40 to the Health and Welfare Fund and $12,783.41 to the Pension Fund. *BU    DC*
   *MARCH 15 2010         FEBRUARY 15*

6. For twenty-four (24) consecutive months commencing on ~~February 1, 2010~~ and ending on ~~January 1, 2012~~, the Company will pay $3,252.56 per month to the Health and Welfare Fund and $2,431.37 per month to the Pension Fund.

7. All payments made on this Note shall be made in Certified Funds.

8. The Company will remit all payments to the Funds' Administrative Offices, which are located at 11465 Cermak Road, Westchester, Illinois 60154.

9. The Company understands and agrees that this Installment Note is based in part on reports submitted by the Company to the Funds and that the Funds reserve the right to conduct an audit, in accordance with the terms of the collective bargaining agreement and the Funds' respective Agreements and Declarations of Trust, to determine benefit contribution compliance for the time period covered herein and further reserve the right to collect any unpaid contributions, union dues, interest, liquidated damages, and audit costs as shown on said audit.

EXHIBIT
B-5

10. Payments made pursuant to this Installment Note shall be considered "contributions" as defined under the terms of the CBA and the Fund's respective Agreements and Declarations of Trust. If the contributions are not paid by the 10th day following the date on which payment should have been received, the contribution shall be considered delinquent and all charges which apply to the late payment of contributions under the terms of the CBA and the Fund's respective agreements and Declarations of Trust shall apply, including, but not limited to, the assessment of interest and liquidated damages. Further, in the event the Company fails to timely make any payments described in this Note, All amounts described in paragraph 1 herein shall immediately become due on the 10th day following the date on which payment should have been received by the Fund's under the terms of this Note. In such event the Company further agrees to pay all attorney fees and costs incurred by the Funds in any action to enforce any part or all of this Note.

11. This Installment Note is conditioned on the Company's staying current on its obligations to the Funds under the terms of the collective bargaining agreement and the Funds' respective Agreements and Declarations of Trust. In the event that the Company fails to maintain its obligations under the terms of the collective bargaining agreement and the Funds' respective Agreements and Declarations of Trust, including, but no limited to, its obligations to submit timely contribution reports and to make timely contribution payments by the tenth day following the month in which laborers' work was performed, then the Funds shall have the right to accelerate and collect all amounts due under this Installment Note, plus payment of all attorneys' fees and costs incurred by the Funds in any action to accelerate this Installment Note.

12. The Company further agrees to obtain and maintain a surety bond to insure the payment of wages and benefit contributions as required under the terms of the CBA.

13. The Company shall have the right to prepay the entire amount due under the Note prior to the date upon which payment is due without penalty and without payment of any precalculated Note interest that has not accrued as of the date full payment has been made.

The Parties hereby agree to these terms by their execution hereof on the _24_ day of the _FEB_, 200_0_.

Aces Environmental Corporation and Aces Environmental Consulting Corporation

By: _____

Title: _PRESIDENT_

Laborers' Pension Fund

By:_____

Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity.

By:_____

# GUARANTY OF PAYMENT AND INDEMNIFICATION

This Guaranty ("Guaranty") is made as of _____ by the undersigned, _____, (the "Guarantor"), to and for the benefit of the **LABORERS' PENSION FUND AND THE LABORERS' WELFARE FUND OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY** (collectively, the "Funds").

WHEREAS, **Aces Environmental Corporation** (the "Company") has agreed to pay a total of **$176,371.97** to the Funds in settlement of late fees owed to the Funds and to be paid under the terms of a Settlement Agreement and Installment Note ("Note").

WHEREAS, the Funds are unwilling to enter into the Note unless the guarantor executes this Guaranty: and

WHEREAS, the Guarantor has a financial interest in the Company and will be benefited by the Note:

NOW THEREFOREWHEREAS, in consideration of the foregoing, the Guarantor agrees as follows:

1. <u>Guaranty of Payment and Indemnification.</u>  The undersigned guarantees, absolutely and unconditionally: (a) the payment when due of the entire principal indebtedness and all interest evidenced by the Note during the twenty-four (24) month payment period including interest and liquidated damages for late or unpaid payments due on the Note; and (b) the full and complete payment of any and all fees and costs incurred pursuant to default under terms of the Note, whether litigation is involved or not, and if involved, whether at the trial or appellate levels or in pre- or post-judgment bankruptcy proceedings in enforcing or realizing upon the obligations of the  Guarantor hereunder (the obligations of Guarantor under this Paragraph 1 are collectively hereinafter referred to as the "Obligations").  The Guarantor also agrees to be personally liable for all monthly benefit contributions, union dues and/or wages owed from the Company to the Funds, the District Council, all ancillary funds, and/or the participants that are due at the time the Note and Guaranty are entered into and/or are incurred and become due and owing for the duration of the Note, including all interest, liquidated damages, audit costs, attorneys' fees and costs.

2. <u>Continuing Guaranty</u>. This Guaranty shall be a continuing Guaranty, and shall not be discharged, impaired or affected by; (a) the existence or continuance of any obligation on the part of the Company with respect to the Note; (b) any forbearance or extension of the time of payment of the Note; (c) the validity or invalidity of the Note; (d) any defenses whatsoever that the Company or any of the party thereto may have to the performance or observance of any term, covenant or condition contained in the Note; (e) the existence or non-existence of the Company as a legal entity; (f) any limitation or exculpation (other than the payment and performance in full of all of the Company's Obligations) that Guarantor may have as to his undertakings, liabilities and obligations hereunder, including any defenses based upon any legal disability of the Company or any discharge or limitation of the disability of the Company, whether consensual or arising by operation of law or any bankruptcy, insolvency or debtor-relief proceeding, or from any other cause, each and every such defense being hereby waived by the Guarantor.

3. <u>Waivers.</u> Guarantor waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time of payment, notice of acceptance of this Guaranty, non-payment at maturity and indulgences and notices of every kind not provided for under this Guaranty.  It is the intention of this Guaranty that Guarantor shall remain liable as principal, notwithstanding any act, omission or thing that might otherwise operate  as a legal or equitable discharge of Guarantor, until all of the Company's obligations shall have been fully paid and performed.

4. <u>Subrogation.</u>  Notwithstanding anything to the contrary elsewhere contained herein or in the Note, the Guarantor(s) expressly waive with respect to the Company any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to set off or to any other rights that could accrue to a surety against a principal, to the Guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker, and which the guarantor may have or hereafter acquire against the Company in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty or the Note.

1

EXHIBIT
B-6

The Guarantor agrees that he or she shall not have or assert any such rights against the Company or its successors and assigns or any other party (including any surety), either directly or as an attempted set off to any action commenced against the Guarantor by the Company (as borrower or in any other capacity) or any other person.

5. <u>Independent Obligations.</u> The Funds may enforce this Guaranty without first resorting to or without first having recourse to the Note; provided, however, that nothing herein contained shall preclude the Funds from suing on the Note or from exercising any other rights; and the Funds shall note be required to institute or prosecute proceedings to recover any deficiency as a condition of any payment hereunder or enforcement hereof.

6. <u>Acceleration.</u> In the event that payments due under the Note shall be accelerated, the Guarantor's obligations hereunder shall also be accelerated without further notice from the Funds.

7. <u>Effect of Bankruptcy.</u> This Guaranty shall continue in full force and effect notwithstanding the institution by or against the Company of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the disaffirmance of the Note in any such proceedings, or others.

8. <u>Termination.</u> This Guaranty shall remain in full force and effect as to the Guarantor until all of the Companys' Obligations under the Note outstanding shall be finally and irrevocably paid in full. Payment of all of the Company's Obligations from time to time shall not operate as a discontinuance of this Guaranty. If after receipt of any payment of all or any part of the Company's Obligations, the Funds are for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible set off, or a diversion of trust fund, or for any reason, this Guaranty shall continue in full force notwithstanding any contract action which may have been taken by the Funds in reliance upon such payment, and any such contrary action so taken shall be without prejudice to the Funds' rights under this Guaranty and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

9. <u>The Company's Financial Condition.</u> The guarantor assumes full responsibility for keeping fully informed of the Company's financial condition and all other circumstances affecting the Company's ability to perform its Obligations, and agree that the Funds will have no duty to report to Guarantor any information which the Funds receive about the Company's financial condition or any circumstances bearing on its ability to perform.

10. <u>Expenses.</u> The undersigned agrees to pay and reimburse the Funds for all cost and attorney's fees, which they may expend or incur in the enforcement of this Guaranty or any of the Company's Obligations under the Note.

11. <u>Delay, Cumulative Remedies.</u> No delay or failure by the Funds to exercise any right to remedy against the Company or Guarantor will be construed as a waiver of that right or remedy. All remedies of the Funds against the Company and the Guarantor are cumulative.

12. <u>Binding Effect.</u> This guaranty shall incur to the benefit of and may be enforced by the Funds, and shall be binding upon and enforceable against the Guarantor and Guarantor's heirs, legal representatives, successors and assigns. In the event of the death of the Guarantor, the obligations of such deceased Guarantor shall continue in full force and effect against his estate, personal representatives, successors and assigns. Without limiting the generality of the foregoing, the Funds (or their successors and assigns) may from time to time and without notice to undersigned, assign any and all of their rights under this Guaranty without in any way affecting or diminishing the obligations of the undersigned hereunder, who shall continue to remain bound by the obligated to perform under and with respect to this Guaranty as though there had been no such assignment.

13. <u>Default.</u> The Guarantor hereby authorizes irrevocably any attorney of any court of record to appear for him/her in such court, at any time after ten (10) days notice after default in any payment due under this Guaranty, and confess judgement against Guarantor, after service of notice of the claimed default, in favor of the Funds for such amount to be unpaid and owed thereon, including interest, liquidated damages and reasonable cost of collection including reasonable attorneys' fees. The Guarantor agrees to waive and release all errors which may intervene in any

2

such proceedings, and consent to immediate execution upon such judgement, hereby ratify and confirming all that said attorney may do by virtue hereof.

14. <u>Warranties.</u> Guarantor makes to the Funds the following representations and warranties:

(a) <u>Authorization.</u> Guarantor has full right, power and authorization to enter into this Guaranty and carry out his obligations hereunder

(b) <u>No Conflict.</u> The execution, delivery and performance by Guarantor of this Guaranty will not violate or be in conflict with, results in a breach of, or constitute a default under, any indenture, agreement or any other instrument to which Guarantor is a party or by which Guarantor or any of his assets or properties is bound, or any order, writ, injunction or decree of any court or governmental institute.

(c) <u>Litigation.</u> There are no actions, suits or proceedings pending, or to the knowledge of Guarantor, threatened against or adversely affecting any Guarantor at law of in equity or before or by governmental agency or instrumentality that involve any of the transactions herein contemplated, or the possibility of any judgment or liability that may result in any material and adverse change in the financial condition of any Guarantor. Guarantor is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court.

(d) <u>Enforceability.</u> This guaranty is a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

15. <u>Notices.</u> All notices or other communications required or permitted hereunder shall be (a) in writing and shall be deemed to be given when either (I) delivered in person, (II) three (3) days after deposit in a regularly maintained receptacle of the United States mail as registered or Certified mail, postage prepaid, (III) when received if sent by private courier service, or (IV) on the day on which Guarantor refuses delivery by mail or by private courier service, and (b) addressed as follows:

In Case of Guarantor

_____
_____
_____

In Case of the Funds:

Collection Counsel
Patrick T. Wallace
Laborers Pension & Welfare Fund
Sub Office
111 W Jackson Blvd
Suite 1415
Chicago IL 60604-3868

or such other addresses as may from time to time be designated by the party to be addressed by notice to the other in the manner hereinabove provided. The Funds will use their best efforts to send courtesy copies of notices provided hereunder to Guarantor's attorney, _____. But the failure by the Funds to send courtesy copies to Guarantor's attorney shall not limit or restrict the Funds' rights under this Guaranty in any manner nor relieve Guarantor of any obligations under this guaranty.

16. <u>Additional Waivers.</u> Guarantor expressly and unconditionally waives, in connection with any suit, action or proceeding brought by the Funds on this Guaranty, any and every right he or she may have to (I) injunctive relief, (II) a trial by jury, (III) interpose any counterclaim therein and (IV) seek to have the same consolidated with any other or separate suit, action or proceeding.

3

17. __Severability.__ If all or any portion of any provision of this Guaranty is declared or found by a court of competent jurisdiction to be unenforceable or null and void, such provision or portion thereof shall be deemed stricken and severed from this Guaranty and the remaining provisions and portions hereof shall continue in full force and effect.

18. __Applicable Law; Venue.__ This Guaranty and the transactions evidenced hereby shall be construed and interpreted under the laws of the State of Illinois. Guarantor, in order to induce the Funds to accept this Guaranty and inter into the loan agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Guaranty shall be litigated, at the Fund's sole discretion and election, only in courts having a situs within the county of Cook, State of Illinois, Eastern Division. Guarantor hereby waives any right he or she may have to transfer or change the venue of any litigation brought against him by the Funds on this agreement in accordance with this paragraph.

19. __Time is of the Essence.__ Time is of the essence of this Guaranty as to the performance of the undersigned.

20. __Death of a Guarantor.__ In the event of the death of Guarantor, the Funds shall have the right to accelerate the indebtedness evidenced by the Note unless, within sixty (60) days of his death, Guarantor's estate assumes his obligations hereunder by an instrument satisfactory to the Funds and delivers to the Funds security for performance of such obligations satisfactory to the Funds.

IN WITNESS WHEREOF, the three undersigned Guarantors has executed this instrument as of the date and year first above written.

Social Security Number

Date: 02/24/10

APPROVED AS TO FORM AND SUBSTANCE
ON BEHALF OF GUARANTOR;

Dated: 02/24/10

4

<h1 style="text-align:center">COMMERCIAL SECURITY AGREEMENT</h1>

**1      PARTIES**

     1     Aces Environmental Corp. (Referred to herein as "Company-Debtor")
          c/o Bonnie Coyne, President

          Bonnie Coyne (Referring to herein as "Individual-Debtor")

          Dan Coyne (Referred to herein as "Individual-Debtor")

          (Company-Debtor and Individual Debtors collectively referred to herein as "Debtors")

     2     Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers District Council of Chicago and Vicinity
          11465 Cermak Road
          Westchester, IL  60154

**2      CREATION OF SECURITY INTEREST**

Subject to the terms of this security agreement ("Agreement"), Debtors grant to Secured Party a security interest in the Collateral to secure the payment of the Obligation.

**3      OBLIGATION**

The obligation secured by this Agreement ("Obligation") is:

     1     Debtors' obligations under the terms of the Installment Note and Guaranty of Payment and Indemnification ("Note") entered into by the Parties in the amount of $176,371.97;

     2     All existing and future liabilities, of any kind, nature, or description, of Debtors to Secured Party arising out of any loan, labor contract, agreement, assignment, endorsement, guarantee, security agreement, federal law, or other transaction, regardless of any other collateral or security delivered or held in connection therewith;

     3     All costs incurred by Secured Party to obtain, preserve, or enforce this security interest, collect the Obligation, or maintain or preserve the Collateral, including (but not limited to) taxes, assessments, insurance premiums, repairs, reasonable attorneys' fees and legal expenses, rent, storage costs, and expenses of sale; and



4       Interest and liquidated damages on the above amounts at the maximum rate permitted by law.

This is a continuing security agreement and will continue in effect even though all or any part of the Obligation is paid in full and even though for a period of time Debtors may not be indebted to Secured Party.

## 4       COLLATERAL

The property to which the security interest attaches under this Agreement ("Collateral") is:

1       All equipment, as that term is defined in the Illinois Uniform Commercial Code, now owned or hereafter acquired by Debtors;

2       All accounts, as that term is defined in the Illinois Uniform Commercial Code, now or hereafter in existence of Debtors;

3       All substitutes and replacements for, accessions, attachments, and other additions to, and tools, parts, accessories and supplies used in connection with, any property described in this Collateral section, now owned or hereafter acquired by Debtors;

4       All products and produce of any property described in this Collateral section;

5       All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any property described in this Collateral section;

6       All records and data (including, but not limited to, ledger sheets, files, documents, photographs, microfilm, microfiche, and electronic media) evidencing an interest in or relating to any property described in this Collateral section, together with all of Debtors' right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

## 5       AGREEMENTS AND WARRANTIES OF DEBTORS

1       **Title.** Debtors represent and warrant to Secured Party that the Company-Debtor or Individual-Debtors or both Debtors hold good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement (and the same will be true of Collateral acquired hereafter when acquired), and that none of the Collateral is affixed to real estate or an accession to other goods, nor will Collateral acquired hereafter be affixed to real estate or an accession to other goods when acquired, unless Debtors have furnished Secured Party the consents or disclaimers necessary to make this security interest valid against persons holding interest in the real estate or other goods. No financing statement covering any of the Collateral is on file in any public office other than those that reflect the security

interest created by this Agreement or to which Secured Party has specifically consented. Debtors shall defend Secured Party's rights in the Collateral against the claims and demands of all other persons.

2    **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, the Collateral is enforceable in accordance with its terms, is genuine, and complies with applicable laws concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Secured Party, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor for goods sold or services performed by Debtors, and there shall be no setoffs or counterclaims against any such account, and no agreement under which any deductions or discounts may be claimed shall have been made with the account debtor except those disclosed to Secured Party in writing.

3    **Perfection of Security Interest.** Debtors agree to execute such financing statements and to take whatever other actions are requested by Secured Party to perfect and continue Secured Party's security interest in the Collateral. Upon request of the Secured Party, Debtors will deliver to Secured Party any and all of the documents evidencing or constituting the Collateral, and Debtors will note Secured Party's interest upon any and all chattel paper if not delivered to Secured Party for possession by Secured Party. Debtors hereby appoint Secured Party as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or continue the security interest granted in this Agreement. Secured Party may at any time, and without further authorization from Debtors, file a carbon, photographic or other reproduction of any financing statement or of the Agreement for use as a financing statement. Debtors will reimburse Secured Party for all expenses for the perfection and the continuation of the perfection of Secured Party's security interest in the collateral.

4    **Collateral Schedules.** Debtors, as often as Secured Party may require, shall deliver to Secured Party, in form satisfactory to Secured Party a schedule of real properties and Collateral locations relating to Debtors' operations (including all subsidiaries and related companies), including without limitation the following: (a) all real property owned or being purchased by Debtors; (b) all real property being rented or leased by Debtors; (c) all storage facilities owned, rented, leased, or being used by Debtors; and (d) all other properties where Collateral is or may be located. Such schedule shall contain such information as Secured Party may require to identify the nature, extent, and location of Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral). To the extent the Collateral consists of accounts, the schedule shall contain such information as

Secured Party may require to identify the nature and age of accounts and the names of account debtors.

5    **Removal of Collateral.** Debtors shall keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral) at Debtors' address shown above, or at such other locations as are acceptable to Secured Party. Except in the ordinary course of its business, including the sale of inventory, Debtors shall not remove the Collateral from its existing locations without the prior written consent of Secured Party. To the extent that the Collateral consists of vehicles or other titled property, Debtors shall not take or permit any action which would require application for certificates of title for the vehicle outside the State of Illinois, without the prior written consent of Secured Party.

6    **Transactions Involving Collateral.** Except for inventory sold in the ordinary course of Debtors' business, Debtors shall not sell, lease, manufacture, process, assemble, furnish under contracts of service, or otherwise transfer or dispose of the Collateral. While Debtors are not in Default under this Agreement, Debtors may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Debtors' business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Debtors shall not pledge, mortgage, encumber of otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Secured Party, even if junior in right to the security interest granted under this Agreement. Debtors shall not allow the Collateral to become an accession to other goods or to become affixed to real estate. Unless waived by Secured Party, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Secured Party and shall not be commingled with any other funds; however, this requirement shall not constitute consent by Secured Party to any sale or other disposition. Upon receipt, Debtors shall immediately deliver any such proceeds to Secured Party.

7    **Maintenance and Inspection of Collateral.** Debtors shall maintain all tangible Collateral in good condition and repair. Debtors will not cause or permit damage to or destruction of the Collateral or any part of the Collateral. Secured Party and its designated representatives and agents shall have the right at all reasonable times to examine, inspect, and audit the Collateral wherever located. Debtors shall immediately notify Secured Party of all occurrences affecting the Collateral or the value or amount of the Collateral, including, but not limited to, any loss of or damage to tangible Collateral, any request for credit or adjustment to any account, or any dispute arising with respect to any Collateral.

8      **Maintenance of Casualty Insurance.** Debtors shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Secured Party may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Secured Party and issued by a company or companies reasonably acceptable to Secured Party. Debtors, upon request of Secured Party, will deliver to Secured Party from time to time the policies or certificates of insurance in form satisfactory to Secured Party, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Secured Party and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Secured Party will not be impaired in any way by any act, omission or default of Debtors or any other person. In connection with all policies covering assets in which Secured Party holds or is offered a security interest, Debtors will provided Secured Party with such loss payable or other endorsements as Secured Party may require. If Debtors at any time fails to obtain or maintain any insurance as required under the Agreement, Secured Party may (but shall not be obligated to) obtain at Debtors' expense such insurance as Secured Party deems appropriate, including if it so chooses "single interest insurance," which will cover only Secured Party's interest in the Collateral.

9      **Application of Insurance Proceeds.** Debtors shall promptly notify Secured Party of any loss or damage to the Collateral. Secured Party may make proof of loss if Debtors fail to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Secured Party, to be distributed as follows: If Secured Party consents to repair or replacement of the damaged or destroyed Collateral, Secured Party shall, upon satisfactory proof of expenditure, pay or reimburse Debtors from the proceeds for the reasonable cost of repair or replacement. Any remaining proceeds shall be first applied toward the Obligation, with any balance distributed to Debtors. If Secured Party does not consent to repair or replacement of the Collateral, Secured Party shall retain a sufficient amount of the proceeds to pay the Obligation, and shall pay the balance to Debtors.

10     **Insurance Reports.** Debtors, upon request of Secured Party, shall furnish to Secured Party reports on each existing policy of insurance showing such information as Secured Party may reasonably request, including the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured; (e) the then-current value on the basis of which insurance has been obtained and manner of determining that value; and (f) the expiration date of the policy. In addition, Debtors shall upon request by Secured Party have an independent appraiser satisfactory to Secured Party determine, as applicable, the cash value or replacement cost of the Collateral.

11      **Taxes, Assessments and Liens.** Debtors will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, this Agreement, and any promissory note or notes evidencing the Obligation and related documents executed in connection with the Obligation. Debtors may in good faith commence an appropriate proceeding to contest such tax, assessment, or lien, and may withhold payment during any such proceedings, including appropriate appeals, so long as, in Secured Party's sole opinion, Secured Party's interest in the Collateral is not jeopardized by such action. If the Collateral is subject to a lien which is not discharged within fifteen (15) days, Debtors shall deposit with Secured Party cash, a sufficient corporate surety bond or other security satisfactory to Secured Party in any amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Debtors shall defend itself and Secured Party, and shall satisfy any final adverse judgment before enforcement against the Collateral. Debtors shall name Secured Party as an additional obligee under any surety bond furnished in the contest proceedings.

12      **Compliance with Governmental Regulations.** Debtors shall comply with all laws, ordinances, rules, and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Debtors may in good faith commence an appropriate proceeding to contest such law, ordinance, rule, or regulation, and may withhold compliance during any such proceedings, including appropriate appeals, so long as, in Secured Party's sole opinion, Secured Party's interest in the Collateral is not jeopardized by such action.

13      **Indemnification.** Debtors assume liability for, and agrees to indemnify and hold Secured Party harmless from and against, and covenants to defend Secured Party against, all claims, causes of action, liabilities, and damages of any kind arising out of or related to the use, maintenance, possession, or management of the Collateral. This agreement to indemnify shall survive the payment of the Obligation and the satisfaction of this Agreement.

14      **Hazardous Substances.** Debtors represent and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability At of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No., 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also

include, without limitation, petroleum and petroleum by-products, or any fractions thereof, and asbestos. The representations and warranties contained herein are based on Debtors' due diligence in investigating the Collateral for hazardous wastes and substances. Debtors hereby (a) release and waive any future claims against Secured Party for indemnity or contribution in the event Debtors become liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Secured Party against any and all claims and losses resulting from a breach of this provision of the Agreement. This agreement to indemnify shall survive the payment of the Obligation and the satisfaction of this Agreement.

15    **Change of Name or Address.** Debtors shall not change its name, or the location of its principal place of business, executive office, or the place where it keeps its business records without thirty (30) days prior written notice to Secured Party.

16    **No Violation.** Debtors are duly formed, organized, validly existing and in good standing in the state of its incorporation or organization, duly qualified and in good standing in every jurisdiction where the nature of its business requires it to be so qualified, and authorized by all requisite action of its stockholders and directors, general partners, or managers to execute, deliver and perform this Agreement.

# 6    POSSESSION OF COLLATERAL AND COLLECTION OF ACCOUNTS

Until Default, and except as otherwise provided below with respect to accounts, Debtors may have possession and beneficial use of the Collateral, and may use it in any lawful manner not inconsistent with this Agreement, provided that Debtors' right to possession and beneficial use shall not apply to any Collateral of which possession by Secured Party is required by law to perfect Secured Party's security interest in such Collateral. Until otherwise notified by Secured Party, Debtors may collect any of the Collateral consisting of accounts. Without prior written consent of Secured Party, Debtors shall not grant any extension of the time of payment of any account, compromise any account for less than its full amount, release in whole or in party any person liable for the payment of all or part of any account, or allow any credit upon an account except for the amount of cash paid thereon. Upon notice to Debtors, Secured Party may at any time prior to Default collect accounts and notify account debtors to make payments directly to Secured Party for application to the Obligation.

# 7    EXPENDITURES BY SECURED PARTY

Secured Party may (but shall not be obligated to) take any action that Debtors are required to take under this Agreement or that is otherwise necessary to obtain, preserve, and enforce this security interest or maintain and preserve the Collateral, without notice to Debtors, and add costs of same, including interest at the maximum rate provided by law from the date incurred to the date of repayment, to the Obligation.

## 8 REINSTATEMENT OF SECURITY INTEREST

If payment is made on the Obligation by Debtors, whether voluntarily or otherwise, or by any third party, and thereafter Secured Party remits any amount of that payment (a) by reason of any federal or state bankruptcy law or law for the relief of debtors to Debtors' trustee in bankruptcy or to any similar person, (b) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Secured Party or any of Secured Party's property, or (c) by reason of any settlement or compromise by Secured Party of any claim made by any claimant (including without limitation Debtors), such amount shall be considered not to have been paid for purposes of enforcement of this Agreement, and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Obligation, and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount had never been received by Secured Party, and Debtors shall be bound by any judgment, decree, order, settlement or compromise relating to the Obligation or to this Agreement.

## 9 DEFAULT

Each of the following constitutes an event of default under this Agreement ("Default"):

1   **Default on Obligation.** Debtor's failure to make any payment when due under the terms of the Judgment;

2   **Non-Compliance with Agreements.** Debtors' failure to comply with or to perform any term, obligation, covenant or condition contained in the Judgment, this Agreement, the Labor Agreement between the Debtor-Company and the Laborers District Council, or any other agreement between Secured Party and Debtors;

3   **Default to Third Parties.** Debtor's default under any loan, extension of credit, security agreement, Promissory Note, purchase or sales agreement, or any other agreement with any other person, that may materially affect any of Debtors' property or ability to repay the Obligation or perform its duties under this Agreement;

4   **False Statements.** Debtors' making any false or misleading warranty, representation, or statement to Secured Party relating to this Agreement;

5   **Dissolution or Merger.** The dissolution or termination of Company-Debtor's existence as a going business, or the merger or consolidation of Debtors with another entity;

6   **Insolvency.** The insolvency of Company-Debtor, the appointment of a receiver for any part of Company-Debtor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any

bankruptcy or insolvency laws by or against Company-Debtor and/or Individual-Debtor.

7    **Collateral Loss or Damage.** Loss, theft, substantial damage, destruction, sale, reduction in value, encumbrance of (other than pursuant to this Agreement), damage to, or change in the Collateral;

8    **Judicial or Other Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Debtors or any governmental agency against the Collateral. Commencement of such proceedings shall not constitute an event of default if there is a good faith dispute by Debtors as to the validity or reasonableness of the claim which is the basis of the proceeding and if Debtors give Secured Party written notice of the proceeding and deposits with Secured Party monies or a surety bond for the proceeding, in an amount determined by Secured Party, in its sole discretion, as being an adequate reserve or bond for the dispute;

9    **Events Affecting Guarantor.** The occurrence of any of the preceding events with respect to any Guarantor of any part of the Obligation, or the death or incompetence of such Guarantor. Secured Party, at its option, may but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Secured Party and, in doing so, cure the Default;

10   **Adverse Change.** The occurrence of a material adverse change in Debtors' financial condition, or the belief of Secured Party that the prospect of payment or performance of the Obligation is impaired;

11   **Insecurity.** Secured Party, in good faith, deems itself insecure.

If any Default, other than Debtors' failure to make payment when due under the Judgment, is curable and if Debtors have not been given prior notice of the Default, it may be cured (and no Default will have occurred), if Debtors, after Secured Party send written notice demanding cure of such Default, (a) cures the default within five days, or (b) if the cure requires more than five days, immediately initiates steps that Secured Party deems in its sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

10   **RIGHTS AND REMEDIES ON DEFAULT**

If Default occurs under this Agreement, at any time thereafter Secured Party shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition, and without limitation, Secured Party may exercise any one or more of the following rights and remedies:

1    **Accelerate Obligation.** Secured Party may declare the entire Obligation, including any prepayment penalty that Debtors would be required to pay, immediately due and payable, without notice.

2    **Assemble Collateral.** Secured Party may require Debtors to deliver to Secured Party all or any portion of the Collateral and any and all certificates of title and other documents related to the Collateral. Secured Party may require Debtors to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party. Secured Party also shall have full power to enter upon the property of Debtors to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Debtors agree that Secured Party may take such other goods, provided the Secured Party makes reasonable efforts to return them to Debtors after repossession.

3    **Sell the Collateral.** Secured Party shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of Debtors. Secured Party may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtors reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligation secured by this Agreement and shall be payable on demand, with interest at the maximum rate provided by law from the date incurred to the date of repayment.

4    **Appoint Receiver.** To the extent permitted by applicable law, Secured Party may have a receiver appointed. The receiver may be an employee of Secured Party and may serve without bond, and all fees of the receiver and his or her attorneys shall become part of the Obligation and shall be payable on demand, with interest at the maximum rate provided by law from the date incurred to the date of repayment.

5    **Collect Revenues, Apply Accounts.** Secured Party, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Secured Party may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligation or apply it to payment of the Obligation in such order of preference as Secured Party may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Secured Party may demand, collect, receipt for, settle, compromise, adjust, sue to foreclose, or realize on

the Collateral. For these purposes, Secured Party may, on behalf of and in the name of Debtors, receive, open and dispose of mail addressed to Debtors, change any address to which mail and payments are to be sent, and endorse notes, checks, drafts, money orders, documents of title instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Secured Party may notify account debtors and obligors on any Collateral to make payments directly to Secured Party.

6    **Obtain Deficiency.** If Secured Party chooses to sell any or all of the Collateral, Secured Party may obtain a judgment against Debtors for any deficiency remaining on the Obligation after application of all amounts received from the exercise of the rights provided in this Agreement.

7    **Other Rights and Remedies.** Secured Party shall have all the rights and remedies of a secured party under the provisions of the Illinois Uniform Commercial Code, as may be amended from time to time. In addition, Secured Party shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

All of Secured Party's rights and remedies, whether evidenced by this Agreement or any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform any obligations of Debtors under this Agreement, after Debtors' failure to perform, shall not affect Secured Party's right to declare a Default and to exercise its remedies.

## 11    MISCELLANEOUS PROVISIONS

1    **Amendments.** This Agreement, together with all documents executed in connection with the Obligation, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

2    **Applicable Law.** This Agreement has been delivered to Secured Party and accepted by Secured Party in the State of Illinois. If there is a lawsuit, Debtors agree upon Secured Party's request to submit to the jurisdiction of the courts of the State of Illinois. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

3    **Expenses.** Debtors assume and agree to indemnify, pay and hold harmless Secured Party and its trustees, employees and agents from all expenses, losses, costs, claims, actions, causes of action, damages of any kind, liabilities, expenses and attorneys fees

and costs that Secured Party may incur or sustain in obtaining or enforcing payment or performance of the Obligation, in exercising its rights and remedies under this Agreement, or in connection with any action, proceeding, or appeal arising out of or related to this Agreement, the Obligation, or the Collateral, whether brought by Secured Party, Debtors or any third party.

4   **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not be used to interpret or define the provisions of this Agreement.

5   **Signatories for Debtors.** If more than one person executes this Agreement as a Debtor, their obligations under this Agreement shall be joint and several.

6   **Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address show above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Debtor, notice to any Debtor will constitute notice to all Debtors. For notice purposes, Debtors will keep Secured Party informed at all times of Debtors' current address(es).

7   **Power of Attorney.** Debtors hereby appoint Secured Party as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sum of money or other property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral; and, if the place and stead of Debtors, to execute and deliver its release and settlement for the claim; and (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Debtors, or otherwise, which in the discretion of Secured Party may seem to be necessary or advisable. This power is given as security for the Obligation, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Secured Party.

8   **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstances, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed

to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

9    **Successor Interests.** Subject to the limitations set forth above on transfer of the Collateral, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

10   **Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver by Secured Party of a provision of this Agreement shall not prejudice or constitute a waiver of Secured Party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Secured Party, nor any course of dealing between Secured Party and Debtors, shall constitute a waiver of any of Secured Party's rights or of any of Debtors' obligations as to any future transactions. Whenever the consent of Secured Party is required under the Agreement, the granting of such consent by Secured Party in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all case such consent may be granted or withheld in the sole discretion of Secured Party.

**DEBTORS ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT, AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED** _02 – 2 4 – 2009._
_2040_

Company-Debtor:

By: _B. Coyne_

Its:_____

Individual-Debtor Bonnie Coyne:

By: _B Coyne_

Individual-Debtor Dan Coyne:

By: _Daniel T Coyne_

—13—

Laborers' Pension and Welfare Funds for the Health and Welfare Department of the Construction and General Laborers District Council of Chicago and Vicinity

By: _____
     James S. Jorgensen

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

LABORERS' PENSION FUND, et al.,                )
                              Plaintiffs,        )        Case No.:  08 C 6871
        v.                                       )        Judge Shadur
ACES ENVIRONMENTAL, CORP., a                     )
dissolved Illinois corporation, ACES            )
ENVIRONMENTAL CONSULTING CORP.,                  )
an Illinois corporation,  BONNIE  COYNE,         )
individually, and DANIEL COYNE,                  )
individually,                                    )
                              Defendants.        )

## DECLARATION OF PATRICK T. WALLACE

I, PATRICK T. WALLACE, declare and state as follows:

1.      I am Funds Counsel for Plaintiffs Laborers' Pension Fund and Laborers' Welfare

Fund of the Health and Welfare Department of the Construction and General Laborers' District

Council of Chicago and Vicinity (the "Laborers' Funds"), Plaintiffs in the above-referenced

action.  This Declaration is submitted in support of the Laborers' Funds' Motion to Reinstate and

Confess Judgment.

2.      Shareholders of the law firms of Allison, Slutsky & Kennedy, and the Law Offices

of Marc Pekay, out-of-house collection counsel for the Laborers' Funds, bill the Laborers' Funds

at a rate of $200.00 per hour for shareholders, $175.00 per hour for associates, and $100.00 per

hour for paralegals.  Affiant, as in-house counsel for the Laborers' Funds, has first-hand

knowledge that the foregoing hourly rates have been found reasonable and have been awarded by

many courts in collection proceedings.



3.     I received a Bachelor of Arts Degree from the University of Illinois at Urbana-Champaign in 1992 and a Juris Doctor Degree from the University of DePaul College of Law in 1995. I was admitted to the bar of the State of Illinois in November 1995 and to the bar of the United States District Court for the Northern District of Illinois in December 1995. I have also been admitted to the bar of the United States District Court for the Central District of Illinois. I was admitted to the Trial Bar of the Northern District of Illinois on September 20, 2000. From November 1995 to August 2000 I practiced labor and employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson (formerly Katz, Friedman, Schur & Eagle). In September 2000, I became Funds Counsel for the Laborers' Pension Fund and Laborers' Welfare Fund for the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity.   Based on the foregoing, $200.00 represents a fair and reasonable market rate for my in-house legal services to the Funds in this matter.

4.     Exhibit 1 attached hereto sets forth the time expended by Fund Counsel in enforcing the Installment Note and bringing their Motion to Reinstate and Confess Judgment. As set forth in that Exhibit, we have expended 2.4 hours totaling $480.00 in attorneys' fees.

I, the undersigned, certify under penalty of perjury that the foregoing is true and correct.

Date: __4/5/10__                          ____Patrick T Wallace____
                                          Patrick T. Wallace

2

Laborers Pension and Welfare Funds
11465 Cermak Rd.
Westchester, IL  60154


Invoice submitted to:
Aces Environmental 3



April 05, 2010


Invoice #10092


Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 3/18/2010 | PTW | Telephone call to T. Miller; Telephone conference with D. Coakley. | 0.20 200.00/hr | 40.00 |
| 3/19/2010 | PTW | Conference with J. Fosco re: payment. | 0.30 200.00/hr | 60.00 |
| 3/22/2010 | PTW | Conference with J. Fosco; telephone call and email to T. Miller. | 0.30 200.00/hr | 60.00 |
| 3/23/2010 | PTW | Update report. | 0.10 200.00/hr | 20.00 |
| 4/5/2010 | PTW | Telephone conference with T. Miller; drafted Motion to Reinstate; Telephone conferences with J. Fosco re: Affdiavit; edits to motion. | 1.50 200.00/hr | 300.00 |
| | For professional services rendered | | 2.40 | $480.00 |
| | Balance due | | | $480.00 |


Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Patrick T. Wallace | 2.40 | 200.00 | $480.00 |


EXHIBIT
C-1

## CERTIFICATE OF SERVICE

The undersigned certifies that he caused a copy of the foregoing Motion to Reinstate to be served upon the following persons via the Court's electronic notification system this 5th day of April 2010.

Todd A. Miller
Kathleen M. Cahill
Allocco, Miller & Cahill, P.C.
3409 North Paulina Street
Chicago , IL 60657
(773) 868-4841


/s/ Patrick T. Wallace